OPINION OF THE COURT
Leonard B. Austin, J.
*596 Introduction
This action was initially commenced by plaintiff seeking a declaration of his standing as a partner in the law firm of defendant F. Chau & Associates, LLE All claims and counterclaims between the parties were discontinued with prejudice by stipulation, so ordered by this court, on January 10, 2003.
The stipulation provides that plaintiff, James J. Bitetto, is entitled to receive 8V2% of the value of F. Chau & Associates, LLP, as of August 31, 2001. His claims with regard to offset and/or conversion were reserved for the trial of the valuation of the practice.
The parties each contended that a different valuation methodology was appropriate under the circumstances presented. Bitetto argued that a fair market/going concern value was appropriate. On the other hand, Associates argued that the practice should be valued on a liquidation basis as if it were dissolved and ceased doing business on the date when Bitetto terminated his relationship with the firm.
Pursuant to the stipulation, the court appointed Barry Pulchin, CPA, a neutral forensic accountant, to prepare a report with regard to both valuation approaches. Thereafter, each party was able to designate an accounting expert, each of whom was deposed prior to the hearing of this matter which took place on December 21, 2004 and January 4 and 31, 2005.
Findings of Fact
A. The Pulchin Valuation of Associates
In his report dated November 23, 2003, Mr. Pulchin opined that the liquidation value of Associates, as of August 31, 2001, was $600,010 with an 8½% interest thereof being $52,000. Pursuant to the stipulation of the parties, Mr. Pulchin also opined with regard to a fair market/going concern value of Associates finding that its fair market value, as of August 31, 2001, was $1,097,000 and an 8½% interest thereof being $94,000.
B. Plaintiffs Case — Valuation
In August 1998, the law firm known as F. Chau & Associates, LLP was formed. Prior to the formation of Associates, defendant, Frank Chau, was a partner in the intellectual property law firm of Dilworth & Barrese LLP. Bitetto was an associate at that firm.
Prior to Bitetto’s departure at the end of August 2001, Associates was an intellectual property law firm employing 10 *597 lawyers, including Bitetto and Chau. Chau has contended throughout this litigation that, despite Bitetto’s claims and the stipulation, Bitetto never was an equity partner in the firm.
Bitetto and Chau never entered into a formal partnership agreement. The nature of their relationship was an oral agreement whereby Bitetto’s compensation was based upon one third of the time he billed plus 20% of all supervision time and 20% for all business he originated. In addition, Bitetto received the use of a credit card. With the credit card, Bitetto was entitled to charge up to $5,000 per year for automobile expenses and 50% of all business-related meals he charged.
No formalities of a partnership were ever observed. That is, while Bitetto was entitled to call himself a “partner,” he had no say whatsoever with regard to the hiring and firing of employees, the nature of the business accepted by the firm, the assignment of staff to do the work, the distribution of profits or the like. In sum, all control and managerial decisions for Associates were vested solely in Chau.
At no time did Bitetto receive any monies which were attributable to the revenue or profits of Associates. Nor did Bitetto contribute any capital to Associates upon its formation. He was not responsible for any losses sustained by Associates. In 2000, Chau gave Bitetto a bonus check of $30,000 which Chau called a “distribution.” That sum was given solely within Chau’s discretion and did not represent a true distribution of partnership interest in Associates. Such payment is not consistent with any equity ownership claim Bitetto has proffered.
During the hearing of this matter, each side called an accounting expert to urge a different approach than that suggested by Mr. Pulchin. Toward that end, Bitetto called Alfred Pruskowski, CPA, who claimed that the Pulchin analysis was flawed in three significant ways, to wit: reasonable compensation, capitalization rates and discount rates.
With regard to the capitalization rates, Mr. Pruskowski urged that Mr. Pulchin erred in using a national economic survey for compensation rather than an analysis of compensation for intellectual property attorneys in this geographic area. Mr. Pruskowski urged a capitalization rate two percent lower than that of Mr. Pulchin (22% versus 20%) based upon an early recoupment of the capital investment in the practice. Finally, since Chau could easily replace Bitetto, Mr. Pruskowski suggested a 20% marketability discount as opposed to Mr. Pulchin’s 35%.
*598 In his analysis, Mr. Pruskowski determined that Bitetto’s fair market/going concern value in Associates, at the stipulated 872% interest, is $165,000 while his liquidation value is $52,000. Significantly, Messrs. Pruskowski and Pulchin agree as to the liquidation value of the practice running in favor of Bitetto as being $52,000, albeit they arrived there by different analyses.
As plaintiffs expert, Mr. Pruskowski attempted to convince this court that a fair market value analysis of the practice was appropriate since Associates’ practice continued after Bitetto’s departure. However, he admitted, on cross-examination, that his analysis included not only the value of the practice at the time of Bitetto’s departure but also for a time thereafter. Most significant was Mr. Pruskowski’s acknowledgment that he relied on various assumptions supplied by Bitetto and his attorney, to wit: Bitetto was a 28% partner in Associates and that he did a substantial portion of the work of the firm. In doing his analysis, Mr. Pruskowski did not even know the number of attorneys employed by Associates at the time of Bitetto’s departure.
Mr. Pruskowski was the only witness called by plaintiff on his case-in-chief. It is significant to this court that Bitetto eschewed taking the stand in support of his claim that Associates was a going practice and the nature of his relationship and involvement with Associates during his three-plus-year tenure. In rebuttal, and to demonstrate Associates should be valued as an ongoing concern, plaintiff called the accountant for Associates who testified that Associates, in its current incarnation as a limited liability company — formed several months after Bitetto’s departure — uses the same tax identification number. He also testified that he understood the end of year payments made by Chau to Bitetto were discretionary bonuses.
C. Defendants’ Case — Valuation
In support of their theory of valuation, defendants called Michael Drogin, CPA, as their expert. As with the other experts, Mr. Drogin opined with regard to both the liquidation value of Associates as well as the fair market/going concern value. The liquidation value of Associates was found to be $456,000 with an 87a% interest thereof being $38,000. As a fair market/going concern value, Mr. Drogin opined that Associates was worth $469,500 with an 87s% value thereof as $40,000. Mr. Drogin urged that the fair market value/going concern valuation methodology is not appropriate for this practice and that the court should adopt a liquidation value methodology.
*599 D. Defendants’ Claim for “Out-of-Pocket” Losses/Offsets
1. Out-of-Pocket Losses
Associates claims that during 2001 Bitetto significantly curtailed his performance in the office. That is, based upon plaintiffs 2000 K-l, he earned $337,787. Included in that sum was a $30,000 bonus. Thus, Bitetto earned the sum of $307,787. In the eight months of 2001, while Bitetto was with Associates, he earned $142,434. Comparing his 2000 earnings to 2001, plaintiff claims that eight months worth of $307,787 is $205,191 or a difference of $62,757.
Based upon Mr. Pulchin’s analysis that on the unadjusted balance sheet the practice’s overhead was 56.9% and, on the adjusted balance sheet, it was 49.3% defendants urge utilizing a blended 50% overhead rate to calculate the loss of revenue. On this basis, they claim that plaintiff was responsible for a $31,378 loss in 2001.
Although defendants compared 2000 to 2001 with regard to plaintiffs compensation, there is no historical basis of plaintiffs income in prior years with regard to his efforts. Nor have defendants established the level of Associates’ business that was being brought in during the 2000 and 2001 periods or whether intellectual property practice experiences greater activity in one time of the year (i.e., the last quarter) than other times of the year. Thus, it is impossible to say that the reduction of production by plaintiff in the eight months in which he worked in 2001 would be attributable to his lack of effort, his planned withdrawal from the firm, a loss of a referral source or some other benign reason which is not apparent on this record.
2. Excess Compensation
During the eight months in 2001 when plaintiff was at defendant firm, he drew a salary of $149,297. However, based upon the tripartite compensation formula (based upon time billed, time spent supervising the work of others and business originated), plaintiff actually earned only $142,434. Thus, Associates seeks a shortfall of $6,863 as an offset against plaintiffs distribution.
3. 40IK Advance/Loan
Associates contends that it advanced the sum of $7,000 to fund plaintiffs 401K plan. The funds were supposed to be solely from plaintiffs earnings, which was the case as of the end of June 2001. However, since plaintiff’s earnings were not as expected and, according to Associates, plaintiff overdrew his *600 earned compensation, the excess $7,000 paid into plaintiff’s 401K should be reimbursed or offset against plaintiffs distribution herein.
By stipulation during trial, the parties agreed that the 401K contribution should be viewed as additional excess compensation paid by Associates to Bitetto.
4. Use of Associates’ American Express Card
Although Bitetto was entitled to utilize Associates’ American Express card for automobile expenses up to $5,000 per year and up to 50% of all business-related meals that he charged, Associates claims that Bitetto charged $840.81 in automobile expenses and $662.23 in meal expenses, neither of which was reimbursed. In addition, in the weeks just prior to his departure, Bitetto charged the sum of $2,697.68 for supplies from Staples, Gateway and Home Depot. The later purchases were apparently for a computer for Bitetto’s home and other expenses which were not related to the business of Associates. While the claims for automobile charges were later withdrawn, the balance of Bitetto’s use of the American Express card remains for determination by this court.
E. Appraisal Fee
Pursuant to paragraph 6 of the stipulation, the parties agreed that while they each bore 50% of Mr. Pulchin’s fees during his appraisal, the determination of which of the parties would bear such fees was referred to this court. Although the apportionment of the Pulchin fee was left to the discretion of the court, the parties specifically provided, “in making its determination, the Court may require the ‘Unsuccessful Party’, as hereinafter defined, to pay all or a portion of the Appraisal’s fee.” The definition of an “Unsuccessful Party,” in part, rested on this court’s determination of whether the distribution to be made to Bitetto was on the basis of a liquidation value of Associates or a fair market/going concern valuation.
Each party paid $12,465.42 toward Mr. Pulchin’s fee of $24,980.84.
Conclusions of Law
A. Valuation Methodology
At the heart of the issue between the parties herein is determining the method of valuation to be adopted by this court. Clearly, this is the pivotal question which must be resolved first.
Bitetto argues that because Associates did not change its name; file a final tax return; amend its certificate with the Sec *601 retary of State; cease business operations; change its address or phone numbers; or notify clients that Bitetto had left the partnership; and it retained all partnership assets, and continued business in the same manner after Bitetto left on August 31, 2001, that the partnership should be valued based upon a fair market value/going concern approach. This court disagrees.
A partner has a right to an accounting as of the date of the dissolution of the partnership (Partnership Law § 74) unless the parties agree otherwise. (Dawson v White & Case, 88 NY2d 666, 670 [1996].) Dissolution occurs upon the withdrawal or discontinuance of a particular member of the partnership which terminates its existence. (Partnership Law § 62 [1] [b]; Aaron v Aaron, 2 AD3d 942 [3d Dept 2003].) Indeed, Partnership Law § 60 defines dissolution as “the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business.” (See also, Gardiner Intl., Inc. v J.W. Townsend & Assoc., Inc., 13 AD3d 246 [1st Dept 2004].)
The continuation of the business of the partnership after its dissolution does not revive the dissolved entity. (Burger, Kurzman, Kaplan & Stuchin v Kurzman, 139 AD2d 422 [1st Dept 1988].) See also, Ruzicka’s v Rager (277 App Div 359, 360 [1st Dept 1950]) where the First Department held:
“A partnership is a contractual relation dependent upon the personality of its members. The admission or withdrawal of a member so radically changes the contractual rights inter se as to produce essentially a new relation even though the parties contemplate no actual dissolution of the firm and continue to carry on business under the same name, under the original articles and with the same account books.” (See also, Balagur v Graubard, Mollen, Horowitz, Pomerangz & Shapiro, NYLJ, Jan. 31, 2000, at 31, col 6 [Sup Ct, Nassau County].)
Continuation of the partnership after its dissolution creates a new partnership at will. (Peirez v Queens P.E.P. Assoc. Corp., 148 AD2d 596 [2d Dept 1989].)
In support of his claim that Associates remained an ongoing partnership for which he is entitled to a going concern valuation, plaintiff relies upon Royal Bank & Trust Co. v Weintraub, Gold & Alper (68 NY2d 124 [1986]). Such reliance is misplaced. In Royal Bank, the defendant partnership continued to operate *602 and hold itself out as an ongoing partnership despite its dissolution. Royal Bank, as a creditor, sought to secure its claim on a note against the partnership despite its dissolution where the partnership continued without any apparent abatement. The Court of Appeals held that, when a partnership continues, an estoppel is created as against third-party creditors unless the party who makes the claim against the partnership knew that the party binding the partnership had no such authority under Partnership Law § 20 (1). Here, there are no third parties involved. The dissolution effectuated between Bitetto and Associates was complete upon his termination of the relationship on August 31, 2001.
Likewise, Dawson v White & Case (88 NY2d 666 [1996]) is inapplicable. The Dawson court addressed the question of whether goodwill was to be factored into the valuation of the dissolved partnership. Plaintiff attempts to read into the Dawson decision that Partnership Law § 74 confers a right to an accounting as against the “partnership continuing the business.” In Dawson, the Court of Appeals merely applied the rule that an accounting is performed by computing the dissolved firm’s assets less its liabilities with an apportionment among the partners as of the date of dissolution. (Partnership Law § 71 [c].) However, the Dawson court was very clear that it was determining the valuation of the partnership as of the date of the dissolution in accordance with Partnership Law § 74.
Finally, plaintiffs reliance upon McDonald v Fenzel (233 AD2d 219 [1st Dept 1996]) does not advance his claim for a fair market/going concern valuation. In McDonald, the Court found that, in the absence of a partnership agreement, contingency fees which were in process during the time of the partnership — as of the date of dissolution — were distributable as against the continuing partnership entity. Here, the various accounting experts took into account work in progress which was earned by Associates as to the date of dissolution, August 31, 2001.
Accordingly, Bitetto is entitled to a liquidation value of Associates based upon the dissolution of that practice on August 31, 2001.
B. Liquidation Value
The testimony of the two experts proffered at trial, Alfred Pruskowski, CPA, and Michael Drogin, CPA, differed with regard to the liquidation value of Associates. The Pruskowski valuation and that of Barry Pulchin, with regard to liquidated value, although they arrived at their conclusions in different *603 ways, were the same: $52,000. The court adopts this figure as his share of the liquidation value of Associates.
While Mr. Drogin’s testimony related to various perceived errors in the Pulchin analysis, his acknowledgment that his analysis was a “limited scope” valuation causes this court to be concerned with regard to the full analysis to have been applied in determining the respected liquidation value. The significant disagreement that Mr. Drogin had with the Pulchin analysis was that he did not account for disbursements receivable and that he assumed full collectibility. Mr. Drogin suggests that it should have been a 75% figure. However, it was not clear from Mr. Drogin’s testimony that he was addressing receivables with regard to an intellectual property practice, such as this, or that he was even viewing the receivables of Associates with regard to its history of collecting disbursements advanced by the firm. Either way, this court finds that the more credible approach was that which was adopted by Messrs. Pulchin and Pruskowski in finding the liquidation value of Associates to be $52,000.
C. Miscellaneous Offsets
The various offsets urged by Chau and Associates with regard to Bitetto’s work performance and various charges were never contested by Bitetto during the course of the trial. In essence, Bitetto satisfied himself to refute Chau’s claims by cross-examination only.
1. Loss of Overhead
Associates claimed that, by virtue of a lower work production on the part of Bitetto, overhead was expended in his regard without due compensation or realization of the investment made by the firm. In support of the claim, Chau and Associates suggested that Bitetto’s production during the first eight months of 2001 was significantly less than that which was done in 2000. However, such analysis does not take into account different work that had been done, but which was not billable, such as with regard to three Infineon projects which were abandoned by the clients resulting in work being done but billing not being sent out.
Thus, it is unclear as to how Bitetto’s failure to book a sufficient number of billable hours during the course of 2001 is a basis for an offset against him in the partnership distribution. In fact, there is no evidence with regard to various other business factors which could come into play as to why there was a difference in Bitetto’s billable hours from 2000 to 2001.
*604 The defendants have failed to establish their claim for an offset in that regard. This is particularly true when it is remembered that there was no partnership agreement between the parties establishing the rights of each of the parties and the partnership with regard to such a circumstance. In fact, until the stipulation of January 10, 2003, Chau hotly contested Bitetto’s status as an equity partner in Associates. In the absence of such an agreement or proof establishing wrongdoing on the part of Bitetto, the court disallows this offset.
D. Excess Compensation
Chau and Associates claim that, during 2001, plaintiff drew more than he actually earned in his time billing. However, as demonstrated by the work but nonbilling of the Infineon matter, it cannot be determined that plaintiff did in fact work less or produce less with regard to his efforts. In fact, Bitetto may well have worked as hard but the vicissitudes of the law practice did not allow all of his efforts to be billed. Thus, it is the court’s view that the amount drawn by Bitetto in 2001 is not necessarily inconsistent with the time and effort which plaintiff expended at the firm. Thus, as with lost overhead, the court declines to assess an offset against plaintiff with regard to the alleged excess compensation he received.
E. 40 IK Advance
By stipulation during trial, it was agreed that the $7,000 paid by Associates to the 401K Plan on behalf of Bitetto represented an element of compensation to Bitetto which was also in excess of that which he earned. As with the excess compensation, it cannot be said that, under the facts presented, it was not earned. Thus, no offset should be had.
E American Express Expenses
The claim with regard to car expenses was withdrawn during Chau’s cross-examination. In addition, there is insufficient evidence on this record to establish that the use of the American Express card with regard to the meals at 50% which were taken by Bitetto in 2001 was excessive or inappropriate. Thus, those offsets will not be allowed. However, there is no question that the purchases at Staples, Gateway and Home Depot were items which were clearly for plaintiffs personal use after he terminated his relationship with the firm. Associates should not, in all fairness, be responsible for paying these items. That Chau may have obtained a computer for his home use, as Bitetto claimed, is of no moment. Thus, Associates is entitled to an *605 offset in the sum of $2,697.68 for the computer and furniture purchased by plaintiff and taken with him after he terminated his relationship with the firm.
G. Apportionment of the Pulchin Fee
Paragraph 6 of the stipulation entered into between the parties establishing plaintiffs claim for 8V2 % of the partnership as of the date of termination provided that the parties would each bear 50% of Mr. Pulchin’s fees with an apportionment at the time of the determination of the matter. The parties wrote into their stipulation an understanding that the court could consider a greater apportionment of Mr. Pulchin’s fee as against the “unsuccessful party.”
As that term is defined, Bitetto is the unsuccessful party in that it has been determined herein that he is entitled to a liquidation value of the firm, not a fair market/going concern value.
Under the circumstances and considering the respective parties and the equities presented herein, this court agrees that an adjustment of the proportion of payment of the Pulchin fee should occur. However, the full fee should not be borne by Bitetto inasmuch as the valuation of the practice was required in any event. Thus, the court determines that Bitetto should bear 80% of the Pulchin fee or $19,984.67.
Since each party paid one half of that fee or $12,465.42, Bitetto should reimburse Associates the sum of $7,469.52, the sum over and above the 20% share of the Pulchin fee for which Chau and Associates are responsible.
H. Recap
Based upon the foregoing, the following is to be awarded to Bitetto in this matter:
Liquidation value of Associates as of August 31, 2001: $52,000.00 Less:
American Express $ 2,697.68
Adjustment of Pulchin Fee $ 7,469.52
($10,167.20)
NET TO BITETTO $41,832.80
To this figure should be added interest from August 31, 2001, together with costs and disbursements as taxed by the Clerk of the court.